53095. HODGES et al. v. DOCTORS HOSPITAL.

QUILLIAN, Presiding Judge.

The plaintiffs, husband and children of the deceased, sought recovery against the defendant hospital for negligent treatment resulting in the decedent's death. The case was tried and at the close of plaintiff's evidence a verdict was directed for the defendant. Appeal was taken from the judgment entered on the verdict. *Held:*

1. The motion to dismiss the appeal is not meritorious. *Strese v. Strese,* 237 Ga. 334 (227 SE2d 749), where the Supreme Court held that under Rule 11 (c), waiver occurs, with regard to failure to comply with the Appellate Practice Act relating to the filing of the transcript, unless objection was made and ruled upon in the trial court prior to transmittal. Thus, where, as here, appellee's motion to dismiss the appeal was not ruled upon prior to transmittal, objection is waived.

2. The sole question raised by appellant is whether the evidence demanded a finding in favor of the defendant hospital. This necessarily involves a determination of

whether the doctor who treated the deceased and whose alleged negligence caused the wrongful death was an employee of the hospital or was an independent contractor.

The appellee urges the applicability of the ruling found in *Clary v. Hospital Auth.*, 106 Ga. App. 134 (1) (126 SE2d 470) and subsequently followed in *Pogue v. Hospital Auth.*, 120 Ga. App. 230 (170 SE2d 53): "Ordinarily, a physician or surgeon on the staff of a hospital is not an employee of such hospital, and in the absence of allegations that the hospital was negligent in the selection of an unskillful physician or surgeon or that the hospital undertook to direct him in the way and manner of treating the patient, the hospital is not liable for the mere negligent performance of professional services by a physician or surgeon on its staff."

Contrary to the appellee's argument, the cases cited in *Clary v. Hospital Auth.*, 106 Ga. App. 134, 135, supra, do not support the blanket proposition that "the hospital is not liable for the mere negligent performance of professional services by a physician or surgeon on its staff." Furthermore, the cases referred to do not broadly hold that a doctor, as a matter of law, is an independent contractor. Instead *Clary* stands only for the principle that a physician on the staff of a hospital is not automatically an employee of the hospital and where a physician is an independent contractor the hospital is not liable for his negligent performance of professional services unless it negligently selected him or undertook to direct him in the manner and method of treating the patient. See Code § 105-502. We therefore do not interpret *Clary* as providing a rule deciding whether the hospital will be liable prior to a determination of whether the relation between the hospital and the doctor was that of master-servant or independent contractor. See, e. g., *Black v. Fischer,* 30 Ga. App. 109, 111 (117 SE 103), petition failed to show doctor under direction of hospital; *Tench v. Downey Hosp.,* 36 Ga. App. 20, 22 (135 SE 106), dicta; *Timmons v. Fulton Bag & Cotton Mills,* 45 Ga. App. 670 (166 SE 40), physician not agent but independent contractor; *Mitchell County Hospital Auth. v. Joiner,* 229 Ga. 140, 141 (189 SE2d 412), doctor "serving on staff" (no

holding that physician was employee or servant), decided on basis of negligent employment. Instead *Clary,* its predecessors and progeny, apply only after it is determined that there is an independent contractor relationship. *Newton County Hosp. v. Nickolson,* 132 Ga. App. 164, 168 (3) (207 SE2d 659).

In ascertaining what relation exists, the requirements are neither complex nor uncertain but their application is extremely difficult. The true test of whether the relationship is one of employer-employee or employer-independent contractor is whether the employer, under the contract either oral or written, assumes the right to control the time, manner and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract. *St. Paul-Mercury Indem. Co. v. Alexander,* 84 Ga. App. 207 (65 SE2d 694); *Weiss v. Kling,* 96 Ga. App. 618 (101 SE2d 178); *Blair v. Smith,* 201 Ga. 747 (41 SE2d 133).

Judge (now Justice) Jordan pointed out the inherent problems involved in *Travelers Ins. Co. v. Moates,* 102 Ga. App. 778, 781 (117 SE2d 924): "Where the question of control is not discussed at the time the service is engaged, and where it never arises during performance, it is often exceedingly difficult to determine whether the employer had, or intended to reserve, such right. However, it has been held in a number of decisions that where one is employed generally to perform certain services for another, and there is no specific contract to do a certain piece of work according to specifications for a stipulated sum, it is inferable that the employer has retained the right to control the manner, method and means of the performance of the contract, and that the employee is not an independent contractor." Accord, *Asbury v. Public Service Mut. Ins. Co.,* 101 Ga. App. 283, 285 (114 SE2d 40); *Harper v. Smith,* 128 Ga. App. 707 (1) (197 SE2d 759).

It should be emphasized that the important consideration is not whether the employer exercised control over the time and manner of executing the work but whether the employer retained the right to do so. *Old Republic Ins. Co. v. Pruitt,* 95 Ga. App. 235, 236 (97 SE2d 521) and cits. For a listing of the factors to be considered in

making a determination, see *Moss v. Central of Ga. R. Co.,* 135 Ga. App. 904, 906 (219 SE2d 593) citing Restatement of the Law, Agency 2d § 220 (2).

All the evidence with regard to the relationship between the hospital and the doctor was presented at the trial through the deposition of Doctor Bernard, the emergency room physician, who treated the deceased at the hospital. The witness stated that he was not employed by the hospital. At the time of the incident in question, he was employed as an emergency room physician and was not being paid. He further related that he was a member of the hospital staff, and a consulting dermatologist, and treated the patient as an emergency room physician for the benefit of the hospital. He stated that he was providing coverage for the hospital but was not working for the same. He then explained that the hospital must be covered by a licensed physician at all times and that the Board of Trustees had required that the physicians who were on the active staff would rotate as such.

The witness further testified that he was not necessarily operating independently of the hospital at the time he treated the deceased but was providing the services of a licensed physician as required by Georgia law. In response to the question of whether the hospital administrator had authority to tell him "this or that or any other thing about what you are doing" the witness replied: "That I'm not too sure about, because the specific administrator of the board of trustees and executive committee is a staff physician." The witness then related that for emergency room service provided during the day that he was paid $100 plus any fee he obtained from the patients, but he was not paid for the emergency service which he performed at night; however, he then explained that in order to participate during the day and receive $100 from the hospital, he also had to participate at night; that in effect the hospital required his services both day and night but only paid him for the daytime service rendered. It was clear from the witness' testimony that the hospital required that he serve as an emergency room physician as a requisite to his remaining on the staff. In answer to the question: "Q. Now, but this was during that one shift, but if you came in — if your shift happened to fall during the

daytime, you would be paid that $100? A. Right. Q. But they certainly had control over the time that you would be there and the things that you would do while you were there as the house emergency room physician? A. How would the — I don't understand the question. How would they have control? Q. They would control the time — you already said they would tell you when you had to be there. A. This is true in a sense. In other words, the physicians on the active staff would rotate, and each physician would spend approximately two shifts per month in the emergency room, and so when a physician on the active staff did not want to take emergency room duty, then there would be a group of us physicians that did emergency room work, were acknowledged and experienced, that would cover that particular physician on that particular day or night."

Although the precise terms of the arrangement between the hospital and the doctor are not defined by the testimony it is evident that the hospital paid the doctor for the service, that it required him to perform the service, and that it exercised control over him in this regard. While the evidence was not conclusive, it was sufficient to raise a jury question and therefore it was error for the trial judge to direct a verdict for the hospital and against the plaintiff in this case.

*Judgment reversed. Stolz and Shulman, JJ., concur.*

ARGUED JANUARY 10, 1977 — DECIDED FEBRUARY 28, 1977 — REHEARING DENIED MARCH 21, 1977 — ▮▮▮▮▮▮▮▮

*Gilbert & Blum, Fred A. Gilbert, David D. Blum,* for appellants.

*Zachary & Segraves, W. E. Zachary, Sr.,* for appellee.